United States v. Wofford, 18-5029. Counsel, if you're ready, we're ready to hear you. Thank you, sir. May it please the court. Counsel, I am Robert Ridenour. I'm here to argue on behalf of Mr. Wofford. There was clear error committed in this case by virtue of the court's admission of a unnecessarily suggestive photo array. The photo array had been shown to the- Let me say, let's re-spot you that for the moment. I think we'll decide that, of course. But assuming without deciding that there were error, why isn't this harmless? Pardon me, sir, why is this- Isn't there a residuum of evidence that makes the case harmless? It's not harmless for a number of reasons, Judge. First of which is that the acquittal on one of the counts, the 924C count, shows that the jury had concerns about the government's evidence and how it came out. So I think that that, for one, shows that there was not harmless error involved here. Second, there were photographs that came from the Quick Trip, which is an Oklahoma convenience store chain that has very good video. This person, my client, was not identifiable from those clear videos. Third- Well, but his clothes, sorry, whoa, his clothing was identifiable. His clothing, well- And if I'm correct, sorry, this seems, maybe I can turn that down a little bit. It seems, as I recall from the video or from one of the stills from the video, that he was wearing a white T-shirt, which is how he was identified. And you could see underneath it a black T-shirt with a little red spot right at the V of the white T-shirt, which is what he was eventually found in, was the black T-shirt with the red design on the shirt. My client was found in a T-shirt that had a red design on it. I think it's a black T-shirt. Black T-shirt with a red design. I may have misspoken. No, a black T-shirt. In the woods. And you can see the black T-shirt. He was found in the woods without shoes, without pants. Sure. But everything about what they identified him as was consistent with what the video was. Judge, I would disagree. Inside the video, my client had a very prominent tattoo that you could see actually in the line-up, and that's not visible in those videos that we're talking about. That's true. My client also had this scar on his face, which was fairly prominent, and it figures prominently in the facts. That was not apparent on his face. So I understand that there was perhaps the coincidence of my client wearing a certain kind of shirt, but my client's clothing that he was wearing at the time of his arrest did not match the clothing that the robber had. Well, the robber was found without shoes and without pants, basically. It appeared he'd disposed of some clothing. My client was found- My client was found with those, yes. And the white T-shirt, a white T-shirt was found nearby in the woods. And the white T-shirt, Judge, was tested for any sort of DNA. I'm just trying to point out there is some consistencies between what was seen in the video. I do understand those things. Unnecessarily inconsistent. Yes, and when Judge Lucero asked me about why is this not harmless area, those are all good details that I pointed out. Also, the testimony was that the woman, the lady, the mama that was in the truck, she testified, or she, excuse me, at the first show up at the scene, she was not able to identify the client, my client. Actually, she said to the officer, Cleon Burrell, he testified at trial that she said that was not the guy. Right, but they didn't use her ID or the show up at trial. That didn't. Of course they wouldn't. They did use the ID of the officer who tailed the vehicle and at one point comes side to side with it. And I understand. And he also testified without objection that he was familiar with this particular individual because he'd encountered him before in a prior setting. He only decided that he encountered my client before whenever he was back writing his reports and said that he had seen, and that was after he'd seen face to face with my client at the scene where he had been arrested. There was no objection to his ID at trial. And that identification, Judge, standing alone would not be enough. These were two people passing by at 30 miles an hour while it was raining in the video. You can see there's rain on the windshield. You know, it's a chaotic going past each other with, you know, 10, 15 feet between them. There's flashing lights, you know. I understand that the officer did testify, but I think that the circumstances that he identified him under said that he knew him. When he saw the person, he didn't say, I recognize that guy. He said simply, white male wearing a ball hat. Later, he saw my client at the scene, obviously. He didn't tell anybody then. I've seen that guy before. I know this guy. It was only later that he came out and saw these previous reports, I guess, that he'd been in and said, oh, I remember that guy now. Those are issues which, Judge, had that been the only evidence against my client, I don't think the government would have proceeded because that's- Well, here's my problem. Yes, sir. Is on these cases, there is a burden on the government to establish the guilt beyond a reasonable doubt. This was a jury trial, right? Sure. The jury makes a factual determination that this is beyond a reasonable doubt guilt. Then, an appellant comes before our court, not on the law, primarily, but when you get to harmless error, you are basically at the factual determination. And so, on the facts now, the argument is, my client is not guilty. Judge, we want you to make the determination on these factual points in our favor, but the fact finder has already made a factual determination on the other side. Here, to follow up on Judge Moritz, there was one eye identification, correct? The officer. In addition to the Daniel Harris, yes, sir. Yes. So, you have the officer pursuing a person, and he drives out and he apprehends a chap and he's, let's forget the clothes for now. How far from where the officer is pursuing? Four miles. I'd say about four miles. I'm not sure. It's from Admiral to Apache. So, that's approximately four miles from the scene of the robbery. Right. But from where he last sees him, how far from there to the point where the guy comes out? The officer testified that he quit the pursuit by virtue of other cars being in front of him whenever they arrived at the scene. There was the pickup abandoned. Later, two or so hours later was whenever my client was found by a dog. The dog, if you look at the testimony, was not on a track at that point. It was just walking around in this area. So, there was not like a scent trail leading from the truck to my client. And I'm not asking you to revisit the jury's decision. I'm saying that the jury's decision was based upon this flawed admission of this overly, because here you had a situation where you had one. It was in part based on what you considered the flawed. That's why I said to you, let's spot you that. I see. Assuming even if you're right about that, the jury is now receiving information, some of which is flawed, but some of which is clearly not flawed. But certainly augmented. I beg your pardon? But certainly augmented by the testimony of the eyewitness. As the cases say, juries love eyewitness testimony. You know, and if you apply some of these thoughts to the split second that Officer Higgins would have seen my client, I think that it may be overstating it to place that much emphasis on what he testified to. I recognize what he said. But the incidents and the facts concerning that identification were certainly at issue. But what you have is an officer who, Daniel Harris sees this robbery. We can talk about some of the infirmities with his testimony. But you have an officer going by that night saying, this person has been arrested. Then giving ample time. And so that's a police action. And ample time is given so that Mr. Harris can look to see if he can find that play, the gentleman on the internet, which he did. And then it was two days later that another officer came by with what I argue is a flawed lineup in and of itself because of the turned head to the left with the tattoo visible. No other person in the lineup had that. My client had fairly clearly orange uniform on at the time. No other person had that in the situation. And also, if you look at it, this officer particularly chose that one picture that had my client's face turned to the left with the tattoo. Testimony established at the motion hearing and at trial that there were actually four other photographs that that officer could have used. One of them, of course, was my guy when he had been bit by the dog and he had blood on his face. Discount that one. There were two others, each of which had my client looking straight onto the camera. So I would argue that not only was there unnecessarily suggestive acts taken by the officers, that officer was told by Daniel Harris. I already saw that dude's picture on the internet. So that was the officer's unduly suggestive answer. Then when you moved on to the totality of the circumstances, one of the main tenets of this case is that Daniel Harris has brain damage. He said that he was in a coma as a child. He admitted, I have problems remembering facts and statements and times and dates and everything like that. It was very clear in that. And so that's why it was error one, because the judge never factored in Daniel Harris's scenario and his infirmities into it, but also by denying me the ability to bring Dr. Gronlund to testify. And our review of that ruling is what? For abuse of discretion? It is abuse of discretion. Yes, sir, I agree. But here I have, you know, there's narrow facts, the cases say that you can bring an expert and eyewitness. Well, we have those narrow facts. We have a gentleman with severe brain damage admitted memory loss issues. That is a particular fact that the jury could have benefited from. Additionally, there is the fact that he had seen the prior, or the picture of my client on the internet, and that is called, and this was actually testified at the preliminary, I mean, sorry, at the hearing, the source monitoring, that the expert could have been able to tell the jury, okay, when he said that he had seen that picture before the lineup, then that means that his ability to recall exactly where he'd seen that face, either it was at the scene or if it was at the lineup, that he was not able to keep those things straight. We as human beings are not able to keep those things straight. And so what that means is that the judge denied me the ability to have an expert say, here is the problems with what this gentleman is saying. I am a learned expert, 28 years as a psychologist, 15 years' worth of experiments, 75 publications identification. Judge denies it and says, well, you can just cross-examine these people. There were particular... Well, and that's, the judge also cited the Perry case in his written order, and you don't even discuss Perry in your brief, and that's pretty significant, because what Perry said was basically, you need to have, if we're going to find this suggestive, you've got to have some sort of state action here. Yes. What we're trying to avoid is the police rigging these lineup procedures. And you don't discuss that. You don't suggest that this was somehow the police's responsibility, the officer's responsibility, that these two individuals looked for the photo on the internet before. And I understand your point now, which seems to be that the officer apparently may have been told, that he may have known they viewed the photo, but that's not state action. And you don't say anything or argue in your brief that police had responsibility for that. Here's our state action, in addition to the infirmities of the actual photo lineup, Judge. I'd say to you then that officer, the first officer comes, nothing in Perry says that has to be intentional wrongdoing. No, it talks about state action and officer's responsibility for the procedures. Officer's responsibility. We have an officer arriving and talking to the witness. This is a big problem, as noted in the cases. You can't tell the eyewitness that the guy has already been arrested before you put him in the lineup. That is an error. And so the first officer committed an error. That's him doing its police action. He did that. Then later, when you have the other officer showing up, he's got what I call is the flawed lineup. But then also, Mr. Harris testified. He told Officer Gatwood, I've seen this guy on the internet. And so that, too, is a state action. Well, you don't make that argument. You don't make that argument for one thing. But you don't cite any case law suggesting that would be state action. This is the first we've heard of it. Well, counsel, can I just pick up on that in the sense that I think the Perry case stands for the proposition that we're trying to deter conduct, improper police conduct. Could you help me understand what improper police conduct would be deterred or should be deterred? Negligent. Negligent police conduct. Because herein, we have an officer going by and informing this witness, hey, witness, we've arrested this guy, thus showing the guy that somehow he's going to be seeing this picture again. It gives him the opportunity to go out and look for this picture. That's on the officer, Judge. And then when you have an officer coming and showing a lineup and the guy tells you, the internet, the officer can't proceed at that point. The officers are charged with protecting and gathering evidence. And here in this case, they didn't do that. That was their actions by telling the guy about it and then using the flawed lineup. Are you suggesting that there's some case out there that says that an officer may not tell the victim of a crime that the supposed perpetrator has been arrested? Wiseman. United States v. Wiseman, 172 F. 3rd, 1196. It is cited in there. It's stated in the Tenth Circuit says, it's wrong to show or to tell someone that the person has been arrested and then show them the lineup. Well, if it's all, sure. Maybe if you do it that way. But here, there's a separation of time between the first act, telling somebody that they've It's all state action, Judge. So I think my time's out. Thank you guys very much. Thank you very much. Thank you. May it please the court. My name is Lena Alam. I represent the United States. I want to begin where the court left off and talk about whether the initial information provided by a different police officer to Mr. Harris, that a suspect had been arrested, irretrievably taints the later identification or the manner of presentation when Detective Gatwood brought the lineup to Mr. Harris. And I think the key in this case about that later presentation of the lineup is that Detective Gatwood testifies and Mr. Harris later confirms in his trial testimony that when he presented the lineup to Mr. Harris, Detective Gatwood said, if he's in there or if there's anyone involved in this crime in this lineup, let me know. And Mr. Harris confirms he said that if he's not in there, just let me know. So unlike a case like Wiseman, where the fact that someone had been arrested and the lineup were contemporaneous, these are separate events. And before showing the lineup, Detective Gatwood took the additional step of warning Mr. Harris that the perpetrator might not be in the lineup. And Mr. Harris understood that to be the case, that Detective Gatwood carefully showed him the lineup, warned him that he might not be in there, and in fact said, I want you to look carefully at each picture because there are six before you make a decision. But of course, Mr. Harris had already looked on the internet and seen a picture of the mugshot of the individual arrested, of this defendant. So how do you disassociate from that? How do you know whether that's part of what he's now seeing? In addition to the tattoo on the right side of his face, no one else with a tattoo or any facial markings that are obviously visible on the right side of their face? Yes, there are several things. First of all, Mr. Harris initially testified that he hadn't looked at the picture until after the lineup was presented to him. But he changed his testimony. Yes. Right. And then the key to Mr. Harris's independent research is Perry v. New Hampshire. And the circumstances are actually fairly similar. In that case, when asked to describe the person that had committed the crime, the witness looked out the window on her own accord and said, there he is right there. And here, in the same way, Mr. Harris independently undertook to find a picture of the perpetrator. For the reasons you identified, Judge Moritz, this is not state action. We don't seek to deter. The Due Process Clause doesn't seek to deter independent research. It seeks to deter police misconduct. In fact, in this case, Detective Gatwood took numerous steps to ensure that this was a fair photo array. In addition to the presentation points that I've previously identified, he used a program to create the lineup, identifying Mr. Wofford's approximate age, race, hair color, eye color. Well, he also testified that he knew that essentially the fact that he had only one photo with a tattoo with a facial marking on the right side might be a problem. And he looked for others, but wasn't able to find them in the time that he looked. Maybe the answer is you don't do a photo lineup in that situation. Perhaps. But the officer did what the law requires, which is he made an effort to find six individuals that looked similar to the suspect. And the case law is pretty clear that individual facial irregularities or different hair, all of these things. Can you point me to any case where there was this kind of circumstance where the witness who was viewing the photo lineup, the only testimony they gave about the physical appearance of this individual was about a facial marking on the upper right side of their face? Because that's different. The cases that you cited, I didn't see any anywhere where we had this kind of circumstance where there was that direct link between the one photo that showed a facial feature or physical characteristics of the individual that they observed. Yes. And I think my key response to that is here the district court found and didn't clearly err in finding that the very small tattoo on Mr. Wofford's upper face was not particularly prominent in the photo in the lineup. You could see it. I can see it right now. If I'm a person who has identified the robber or the carjacker as someone who had a scar on the upper right side of their face and then I see a photo lineup with one individual with a facial marking on the upper right side of their face, plus I've looked at that person's photo on the internet the day before and seen that that person has a tattoo on the upper right-hand side of their face, you have to admit we've got a bit of a problem there. Well, it's clear that Mr. Harris's independent research cannot play a role in this court's due process analysis. But even assuming that— Well, it may be a factor that we would consider in the totality of the circumstances as to either whether it's suggestive or reliable, the reliability in particular. Yes. And going back to assuming, as Judge Lucero suggested, even assuming that this was an unduly suggestive array and that it was presented in a suggest—or that it was presented in a suggestive manner, the identification here meets all of the criteria for reliability. Mr. Harris's— On that point, let me ask you this. Is there any evidence in the record that indicates that there was a description of the perpetrator by Mr. Harris prior to his apprehension or prior to any photograph—photographic presentation in which he described the perpetrator as having a tattoo on his face? Mr. Harris never used—never described the perpetrator as having a tattoo. I believe—I don't— He described him as having a scar on the upper right side of his face. That's correct. That's correct. He described a scar but not a tattoo, right? That's right, Your Honor. Is there any indication from the record that the scar and the tattoo appear in any manner similar to each other? There's no description of the scar, and so other than the photographs of Mr. Wofford in the record, there's no basis to know that. Was he cross-examined on his earlier comment that it was a scar and now it was a tattoo? Was he cross-examined on that point? I'm not certain, Your Honor. He was cross-examined extensively by Mr. Reidenauer about the reliability of his identification, about his memory problems, and about the fact that he had gone on his own and looked at a picture of Mr. Wofford before making the identification from the lineup. When we're talking about the characteristics of Mr. Wofford, I want to clarify something that came up earlier. Heidi Argumendo, the woman who was in the carjacked Silverado, did fail to identify Mr. Wofford at the scene, at the show-up that was never presented to the jury. But she specifically testified in the pretrial hearing at, I believe, page 54, volume 3, that the guy was wearing different clothes. And it's uncontroverted that at the time of his apprehension, Mr. Wofford was wearing different clothes than pictured in the quick trip video, in the still photos that are included in my brief. So I'm not clear what you're trying to... How does that... How do we factor that in? How does that help you? To the extent that Mr. Reidenauer is arguing that that failure to identify somehow undermines the reliability of the identification or the harmless error aspect of this, I think there's an explanation for that in the record. And that really takes me... Would you walk me through that again, please? Sure. The QED somehow doesn't click for me. To the extent that Mr. Reidenauer is arguing that either... Well, go to the premise before you go to the conclusion, please. Sure. Even assuming that... The premise is, she said that the chap in the photograph that was apprehended and the chap that she saw were wearing different clothes. That's what you said? Yes. In her testimony about the show-up identification at the scene, Ms. Argumendo testified... Let's call her Ms. Argumendo. Ms. Argumendo, is it? It is. She testified that she was not able to identify the person that was brought before her at the show-up. And she explained he was wearing different clothes than the person that had pointed a gun at her. That sounds to me like that's a powerful defense point. Except... So assuming Argumendo, that Ms. Argumendo saw two differently clothed individuals that were within a contemporaneous period, that doesn't seem to me to be very favorable to the government. Because the evidence as it came out at trial was that the individual that perpetrated the carjacking was wearing a white V-neck T-shirt over a black T-shirt with a little red logo showing in the V-neck, and pants and shoes. Mr. Wofford was apprehended some two hours later in the woods wearing a black T-shirt with a red logo. And between 10 and 20 yards away from where the Silverado had been crashed into a ditch, officers found a white V-neck T-shirt. Mr. Wofford was not wearing either shoes or pants. And as counsel for the government argued in closing, that was consistent with someone who, while running away from a police pursuit, had removed his top T-shirt, his pants, and his shoes. Right. So I would not conclude from that that the perpetrator was wearing different clothes. I would just say that he was clothed differently at the time. Yes, that to the extent that Ms. Argumendo was unable to identify Mr. Wofford as the perpetrator, that there is at least circumstantial evidence that explains why that might be so. And so her failure to identify him does not necessarily weigh against the reliability of Mr. Harris' identification. Or does it undermine the independent evidence that demonstrates that any error here was harmless? Could I get you to address harmlessness? Yes. In this case, even assuming first that the lineup was unduly suggestive and that all there was sufficient evidence in the record to support Mr. Wofford's conviction, Officer Higgins testified, based on his opportunity to observe the perpetrator, that he identified Mr. Wofford as that perpetrator. And that identification was not challenged either at trial or here on appeal. As well, as I've sort of described, there was strong circumstantial evidence of Mr. Wofford's guilt. The offense took place at a quick trip. The offender was driving the stolen gray pickup with a yellow ATV in the back. A police officer shortly after the call went out observed that car driving northbound on the road, followed the car, and Officer Higgins was that officer, and had the opportunity to observe, and then followed him up, dropping back but still observed by other police officers until that Silverado's crashed in a ditch in a wooded area. Mr. Wofford was found approximately 150 yards from the place the truck crashed and and was in the middle of the woods late at night without shoes or pants and was found and approximately 10 to 20 yards from the crash Silverado that white t-shirt was found. Given the strong circumstantial evidence from that, from the quick trip video that depicts the apparel of the individual who committed this offense, and Officer Higgins' identification, all of those things in totality would demonstrate any error in admitting Mr. Harris's lineup identification would have been harmless. I will just address very briefly, the district court did not abuse its discretion in excluding Dr. Gunlund's testimony in particular because as the court identified that much of his testimony was directed at the show-up identification, not at the lineup, and because it was difficult to tell how much he would be relying on his own research and how much on his reading of the literature. Also, it would have usurped- That would be permissible. Experts, professionals can rely on professional hearsay and arriving at conclusions. Nothing wrong with that. Your Honor, I see that my time is up. May I answer? Your time is up, so why don't you disregard my comment in the interest of hearing the next case. Counsel, we don't want you to leave thinking that we cut you off with a lot of questions and that gave you no time for rebuttal. Would you care to take a minute or so if you don't mind being excused at this point? If you have anything, be aware that this is the sufferance of the court. Don't abuse it, please. Well, the judge had asked, Ms. Saro, you had asked about whether Mr. Harris was cross-examined at trial about the tattoo versus scar. Yes. Actually, whenever I started, and this is Volume 3, 253, I began to ask him about that, and he then said, well, actually, he told the police it had been a tattoo. So he changed his story about that at the trial, so I didn't go further because I had his report saying it was a scar. Okay. So he was inconsistent on that point. Yes, and so that was the extent of the cross-examination, but here's my thing as to harmlessness. Only one eyewitness from the scene of the crime identified my client at trial, regardless of the officer, regardless of the shirt, regardless of the tattoo, only one person testified at trial that I was at the scene, and that's the gentleman. That was Daniel Harris with brain damage, with a bad lineup, and police action in causing it from my perspective. So that is the reason why Judge Dowdell should have suppressed that, and that's why it's not just harmless error. Thank you, guys. Thank you.